IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

JUAN NIETO,

        Plaintiff,

v.

MICHAEL DITTMAN, KARL HOFFMAN,
ISAAC HART, ANA BOATWRIGHT,
CINDY O'DONNELL, KEISHA PERRENOUD,
KAREN ANDERSON, CANDICE WARNER,
MEREDITH MASHAK, KIM CAMPBELL,
DENISE VALERIUS, KATHLEEN WHALEN, and
SALAM SYED,

        Defendants.[1]

OPINION & ORDER

16-cv-163-jdp

---

        Pro se plaintiff Juan Nieto, a prisoner in the custody of the Wisconsin Department of Corrections, is proceeding against defendant prison officials on deliberate indifference and medical malpractice claims. Nieto contends that defendants delayed diagnosing and treating his broken toe and bone spurs for almost two years, despite knowing that he was in great pain. Defendants have moved for summary judgment on all claims. Dkt. 43. Disputed issues of material fact preclude resolution of several claims, so I will deny defendants' motion in part and recruit counsel to assist Nieto at trial.

---

[1] I have updated the caption to reflect the correct spelling of defendants' names.

## UNDISPUTED FACTS

The following facts, except where noted, are undisputed.

Nieto is currently incarcerated at the Stanley Correctional Institution (SCI). He was incarcerated at the Columbia Correctional Institution (CCI) from June 27, 2006, to July 13, 2017.

On November 11, 2013, Nieto submitted a health services request (HSR) about "problems" with his feet and wrist. Dkt. 46-1, at 72. The next day, Nieto met with defendant Kim Campbell, a nurse. He explained that his right wrist and both of his big toes hurt ever since he slipped and fell into the wall during recreation two weeks prior. Campbell noted that Nieto's left big toenail appeared "yellow" and "brittle," but otherwise showed no bruising or swelling. *Id.* at 118. (Nieto now says that in fact his left toe was bruised and swollen. Dkt. 42, at 45:22–46:5.) Campbell noted that Nieto expressed "slight discomfort" to palpation of the left toe. Dkt. 46-1, at 118. She instructed Nieto to rest and use acetaminophen to control the pain. She indicated that she scheduled a follow-up appointment in two weeks.

Five days later, Nieto submitted another HSR explaining that the medication he received did not adequately control the pain in his feet and wrist. *See id.* at 73–74. He requested another appointment and was told that one was scheduled.

Nieto attended a follow-up appointment with defendant Denise Valerius, another nurse, on November 25. *Id.* at 25. Valerius noted that Nieto rated the pain in his toes as a seven out of ten, with the right toe more painful than the left. She noted a decreased range of movement in the right toe due to the pain. She gave Nieto ibuprofen to control the pain and instructed him to submit another HSR for a follow-up appointment with a doctor if he found no relief after two weeks. Nieto says he submitted another HSR on December 10, about two

2

weeks later, "requesting help in pain," but the evidence that he points to in support of this proposed fact—"exhibit 6"—has not been filed with the court. Dkt. 57, ¶ 30; *see also* Dkt. 24 (informing Nieto that "exhibit 6" was not included with the exhibits he submitted). Medical records do indicate, however, that Nieto was prescribed ibuprofen on December 26. *See* Dkt. 46-1, at 35.

On January 21, 2014, Nieto submitted another HSR complaining that he still hadn't been seen by a doctor about "the problem" with his "feet." Dkt. 46-1, at 71. A response dated January 22 indicated that Nieto was scheduled to see a doctor. There's no record of a visit with a doctor, but on January 24, Nieto was prescribed ibuprofen, among other drugs. *See id.* at 34.

After waiting several months, Nieto submitted another HSR on March 31, complaining that it "had been 5 months since" he had been seen "about the problems with [his] feet," despite his being told that a doctor would see him. *Id.* at 70. He explained that "the problem [was] still hurting [his] feet." *Id.* A response dated April 2 indicated that Nieto would be seen by a doctor "in approximately a month." *Id.* But that appointment never materialized.

Nieto submitted another HSR on July 14, complaining that he had "been waiting to see the doctor for more than six months about the problem with [his] foot." *Id.* at 67. Valerius responded the next day indicating that he was scheduled to be seen by a nurse in "mid-August." *Id.* On August 10, Nieto submitted another HSR. *See id.* at 64. The first page of the request concerns an unrelated problem with Nieto's eye. A second page is missing. Defendant Meredith Mashak, a health services manager, responded to the request the next day: "Opto apt this week. Sick call for eye & toenails." *Id.*

On September 8, Nieto submitted another HSR explaining that he was supposed "to see the doctor in the middle of last month for the problem with [his] toes" but was never called

for an appointment. *Id.* at 65. He asked for an appointment "sometime in this week." *Id.* The next day, he received a response that he was scheduled for a follow-up appointment with a doctor. *Id.* But once again, that appointment never materialized.

On November 14, Nieto was seen by defendant Kathleen Whalen, a nurse clinician. (The records for that appointment indicate that it was "initiated by" an HSR dated November 13, *id.* at 23, but neither party has submitted a November 13 request.) Whalen noted that Nieto reported that the pain in both of his big toes had lasted for more than a year, he saw a nurse "last year" about this pain and was supposed to see a doctor about it but never did, and that after running for about 10 minutes, the pain escalated to the point that he couldn't walk. *Id.* Nieto rated the pain as a 4 or 5 out of 10. He explained that he thought x-rays would be appropriate to diagnose the problem. Whalen examined Nieto's toes and noted that circulation, motion, and sensation were "good" and that there were no visual deformities other than fungus under the right toenail. *Id.* Whalen instructed Nieto to continue exercising "as able," use over-the-counter medication to control the pain, and notify the Health Services Unit if his symptoms worsened. *Id.* at 24. At Nieto's request, she scheduled a follow-up appointment with a doctor. A week later, Nieto submitted an HSR complaining that he was charged two copayments "to be seen for the same problem." *Id.* at 60. Mashak responded that a second copayment was due because he "had not been seen in over 60 days." *Id.*

On January 14, 2015, Nieto was first seen by a doctor, defendant Karl Hoffman. According to Hoffman's notes, Nieto complained of pain in his right big toe that began "approximately 10 months ago" when he slipped and "kicked the wall" while playing basketball; the pain had "gradually improved" since then but not disappeared. *Id.* at 21. Hoffman examined Nieto and noted that "[t]e right toenail is thickened and yellow [and t]he

4

right great toe is tender." *Id.* He also noted "[d]iscomfort with passive motion of both the MTP and PIP joints [and a] thickening of the distal right first metatarsal suggestive of a bone spur." *Id.* He prescribed Nieto medication to treat the apparent fungal infection and ordered x-rays of the right big toe. Hoffman did not mention Nieto's left toe, but Nieto argues that he complained of pain in his left toe during the January 14 encounter—he points to a nurse's report written later that year, which records Nieto's complaint that "back in January, [he] told Dr. Hoffman both [his] feet were hurting," but Hoffman only ordered x-rays of his right foot. *Id.* at 19. Hoffman states in a declaration that Nieto never complained about his left toe at the January 14 encounter. *See* Dkt. 50, ¶ 11.

On January 20, x-rays were taken of Nieto's right foot. A radiologist found "a small avulsion fracture [at the] base of [the] first proximal phalanx." Dkt. 46-1, at 39. Hoffman reviewed the radiologist's report on January 23. It appears that he did nothing in response. He now states in his declaration that the "standard protocol" for treating such a fracture "would be rest and over-the-counter pain medication, which Nieto had available to him." Dkt. 50, ¶ 12.

On June 3, Nieto submitted an HSR that read, "A couple months ago you took an x-ray on my foot, but you never told me if I have a fracture or not because I'm still feeling the pain every time I jump or kick something by accident." Dkt. 46-1, at 50. He was told to "send disbursement form for copy." *Id.* On June 15, Nieto submitted another HSR that read, "Like a week ago I wrote to you asking about the x-ray that you took of my foot. What I want to know is what are the results of the x-ray. Please could you let me know because I'm still feeling pain. Thank you." *Id.* at 49. He was against directed to submit a disbursement form. He submitted

the required form on June 18 and received a response the following day with a one-page enclosure—presumably a copy of the radiologist's report. *See id.* at 48.

On July 8, Nieto filed a grievance about "the lack of proper treatment" for his "broken bone." Dkt. 19-2, at 11. He attached some medical records and a timeline of his HSRs and medical appointments. He asked that he be scheduled to see a doctor "to get effective management of pain" and that he be referred to an orthopedist, among other things. *Id.* at 13.

On July 15, Nieto submitted another HSR:

> I [have] been writing to you about the problems with my toes. You already make an x-ray of one and found that was a fracture on it and also I would like to know when you are going to check the other one the pain I feel is the same to the one that I have the fracture, and please can you send me to see a foot doctor and also I have seen nobody in like 6 months concerning with the problems, well with the fracture of my toe. I have received no treatment and no medication and I still feel the pain on my toes. You x-ray one of my toe but I still waiting for you to x-ray the other.

Dkt. 46-1, at 43–44. On July 19, Valerius responded, "Sick call scheduled." *Id.* at 44.

On July 21, Nieto met with an unidentified nurse. He explained that he had told Hoffman in January about pain in both feet, that only his right foot had been x-rayed, and that he hadn't received any follow-up care since then. The nurse's notes indicate that Nieto described the pain as "throbbing" and "constant" and rated it as a 7 out of 10. *Id.* at 19. The nurse examined Nieto and noted that both feet were "swollen," especially near the toes, and "tender to touch." *Id.* at 20. The nurse also noted that a January 2015 x-ray showed a fracture, but no follow-up care was provided. The nurse scheduled Nieto to meet with another doctor, defendant Salam Syed, within seven days.

On July 24, defendant Isaac Hart, an institution complaint examiner, reviewed Nieto's grievance and additional medical records. He also provided the complaint to Mashak, who

reviewed it and provided a response that summarized the main events surrounding Nieto's toe injury. Mashak indicated that she would schedule an "appointment for evaluation of avulsion fracture." Dkt. 19-2, at 2. Hart recommended dismissing Nieto's grievance because it appeared that Nieto's "concerns are being addressed, . . . [h]e continued to be seen by medical staff . . . there is no indication the treatment offered is not adequate to the demonstrated need[, and Mashak] reviewed" the grievance. *Id.* at 2–3. Defendant Keisha Perrenoud, the health services regional nursing coordinator, reviewed Hart's recommendation and agreed with it. *Id.* at 4. Nieto appealed, and eventually, the dismissal was affirmed by defendant Ana Boatwright, a corrections complaint examiner, and defendant Cindy O'Donnell, a designee of the secretary of the Department of Corrections. *See* Dkt. 19-2, at 6, 7.

On July 31, Nieto met with Syed. Syed's notes indicate that Nieto said he'd been "having problems with both of his great toes since 2013." Dkt. 46-1, at 16. Syed was "not sure if" Nieto was "telling the truth" about "having exactly the same" symptoms in his other toe, but he scheduled an x-ray. *Id.* Syed also prescribed pain medication and referred Nieto to physical therapy to get fitted for splints on both toes.

On August 4, x-rays were taken of Nieto's left foot. A radiologist found "a fracture at the proximal plantar aspect of the distal 1st phalanx with no significant displacement or angulation [and] no significant degenerative changes." *Id.* at 37. Someone reviewed the radiologist's report the same day, but it's not clear who—the signature is illegible.

On August 12, Nieto submitted an HSR asking for the results of the x-ray. *See id.* at 42. On August 18, having received no response, Nieto submitted another HSR reiterating his request for the results and including a "disbursement for the cost of the report." *Id.* at 41. On August 24, still having received no response, Nieto submitted another request, which read,

7

> I have been waiting for the things that you was supposed to send to me for the pain on my toes, the things to hold my toes together, and also the [illegible] about the shoes. Also I have been waiting for the last 2 or 3 weeks about the result of the x-ray of my left toe and I have received nothing yet.

*Id.* at 40.

On August 26, Nieto received a copy of the radiologist's report and a note from Hoffman, which read "x-rays confirm Dr. Syed's diagnosis of a non-displaced fracture of the great (big) toe. Treatment is non-operative—rest, possible splint." Dkt. 46-1, at 42. The same day, Hoffman entered two orders for a repeat x-ray on Nieto's right toe and a physical therapy consult for a "splint or post-op shoe for fracture great toe—if indicated (now approaching 1 month out)." *Id.* at 32.

On September 1, x-rays were taken of Nieto's right foot. A radiologist compared the results to the January 20 x-rays and found "no acute osseous deformity or displaced fracture [and] no joint subluxation or angular malalignment." *Id.* at 36. The radiologist concluded that Nieto's right toes were "grossly intact." *Id.*

On September 11, Whalen informed Nieto that he would be seen by physical therapy (presumably to be fitted for a splint) "as schedule allows." *Id.* at 40.

On September 16, Nieto submitted an HSR asking for a copy of the September 1 radiologist's report. *See id.* at 78. He received a copy two days later.

On October 10, Nieto submitted another HSR:

> I have [not] had any medication for the pain on my toes since the last month and also on ice neither. I ask for a refill and you said this was expired, so you give me the medication for a month, and then after the month still have the pain but not the medication. Can you tell me how this is going to work please.

8

*Id.* at 75. He was told to discuss the issue during his October 16 appointment with Syed, which was originally scheduled to renew an unrelated prescription. Syed's notes for that appointment indicate that he "had a long discussion" with Nieto about the toe pain, during which he explained that if the pain was "not severe enough," they could continue with "conventional pain management," but that a cortisone injection could be used if the pain was bothersome enough. *Id.* at 15. Syed recorded that Nieto did "not want any procedure at this time." *Id.* Nieto testified at his deposition that he asked for cortisone injections at some point and was told that he would receive them every six months, but he never actually received them. *See* Dkt. 42, at 56:23–58:1.

Nieto met with health services staff several times in 2016 and the spring of 2017 concerning unrelated medical issues. (Defendants point out that one of these appointments included a stress test where Nieto was able to walk on a treadmill for more than 10 minutes. *See* Dkt. 57, ¶ 70.) According to the available medical records, it was not until June 9, 2017, that Nieto requested another appointment concerning pain in his toes. *See* Dkt. 46-1, at 5. He was seen by a nurse on June 11. The nurse recorded his complaint as follows: "I have pain both feet all the time, can't run or even walk fast, was supposed to get an injection but was never called." *Id.* Nieto rated his pain as a 3 out of 10, reported that it began "years" ago, and that Tylenol offered no relief. *Id.* The nurse scheduled a follow-up appointment with a doctor. It appears that Nieto attended an appointment on June 19 concerning his foot pain, but the notes from that appointment are largely illegible, and neither party addresses it. *See id.* at 3.

On July 13, 2017, Nieto was transferred to SCI.

ANALYSIS

Defendants moves for summary judgment on all of Nieto's claims. At summary judgment, I must view the evidence in the light most favorable to Nieto, as the nonmoving party. But Nieto also bears the burden of coming forward "with specific facts showing that there is a genuine issue for trial." *Armato v. Grounds*, 766 F.3d 713, 719 (7th Cir. 2014) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

A. **Eighth Amendment claims**

I begin with Nieto's Eighth Amendment claims. Nieto contends that each defendant was deliberately indifferent to his broken toe. To succeed on a deliberate indifference claim, Nieto must show (1) that he "suffered from an objectively serious medical condition," and (2) that the defendant was "deliberately indifferent to that condition." *Rasho v. Elyea*, 856 F.3d 469, 475 (7th Cir. 2017) (quoting *Petties v. Carter*, 836 F.3d 722, 727–28 (7th Cir. 2016) (en banc), *cert. denied*, 137 S. Ct. 1578 (2017)). Defendants concede that whether Nieto suffered from an objectively serious medical condition is a factual dispute to be resolved at trial. The decisive question is whether each defendant was deliberately indifferent.

"Deliberate indifference requires that a defendant actually know about yet disregard a substantial risk of harm to an inmate's health or safety. 'The standard is a subjective one: The defendant must know facts from which he could infer that a substantial risk or serious harm exists and he must actually draw the inference.'" *Id.* at 476 (citation omitted) (quoting *Zaya v. Sood*, 836 F.3d 800, 804 (7th Cir. 2016)). "[W]here evidence exists that the defendants knew

better than to make the medical decisions that they did, a jury should decide whether or not the defendants were actually ignorant to risk of the harm that they caused." *Petties*, 836 F.3d at 731. In *Petties*, the Seventh Circuit "identified several circumstances that can be enough to show deliberate indifference. First, and most obvious, is a prison official's decision to ignore a request for medical assistance." 836 F.3d at 729. Another "is an inexplicable delay in treatment which serves no penological interest." *Id.* at 730. Yet another is choosing "an 'easier and less efficacious treatment' without exercising professional judgment," for example, by providing "only painkiller and ice to an inmate suffering from [a] suspected fracture." *Id.* (quoting *Estelle*, 429 U.S. at 104 n.10) (citing *Conley v. Birch*, 796 F.3d 742, 747 (7th Cir. 2015)). Even if certain defendants, such as nurses, "lack[] authority to provide particular forms of medical care," they still "have an independent duty to ensure that inmates receive constitutionally adequate care" by, for example, discussing their "concerns with the treating physician or contacting a responsible administrator." *Perez v. Fenoglio*, 792 F.3d 768, 779 (7th Cir. 2015) (quoting *Berry v. Peterman*, 604 F.3d 435, 443 (7th Cir. 2010)).

In short, the evidence viewed in Nieto's favor shows that his serious medical condition was repeatedly ignored, that assessment and treatment of the condition were delayed for years, and that he never received complete treatment. But the question is whether each defendant individually knew of and disregarded Nieto's serious medical condition.

Before discussing the individual defendants, I'll address defendants' overarching argument that Nieto's claims concern only "his left big toe." Dkt. 44, at 2. They base this argument entirely on the following statement from Nieto's deposition: "I still have the pain of the right foot, but my claim is not from the right foot, because I don't have any proof saying that anything is wrong with my right foot. I do have proof of my left foot." Dkt. 42, at 18:7–

11

10. This statement is surprising because Nieto's initial complaint did not specify which toe was injured but referred to "bilateral foot pain," Dkt. 6, at 7; I granted him leave to proceed on claims concerning a "broken toe" without specifying which toe, Dkt. 7, at 1; and Nieto *does* have proof that there is something wrong with his right foot. The deposition transcript indicates that defendants' counsel was surprised by Nieto's statement, too. It appears that Nieto believes that the law would not support a claim concerning his right toe because it appears to have healed, as he makes clear that he was not satisfied with defendants' treatment of the right toe. *See* Dkt. 42, at 17:22–25. Nieto is mistaken. I will not hold a pro se plaintiff's misunderstanding of the law against him, at least not when defendants will not be prejudiced. Here, there is no indication that defendants will be prejudiced. As the recitation of facts above indicates, the evidence concerning the left toe overlaps almost completely with the evidence concerning the right toe. And defendants have time remaining to conduct additional discovery if they wish. So I will not limit Nieto's claims to his left big toe.

I turn now to the claims against individual defendants. I begin with Valerius. She examined Nieto's toes on November 25, 2013, noted that Nieto reported significant pain, gave him ibuprofen, and instructed him to submit another HSR in two weeks "if no relief" so that he could be seen by a doctor. Dkt. 47-1, at 25. So far, so good—there's no indication that Valerius knew or even suspected that Nieto's condition required additional treatment at that time. But on July 15, 2014, Valerius saw Nieto's HSR complaining that he had been "waiting to see the doctor for more than six months about the problem with [his] foot," and she responded that he would be seen by a nurse in "mid-August"—but Nieto wasn't seen until November. *Id.* at 67. A reasonable juror could infer that Valerius knew that Nieto's toe injury continued to bother him more than six months after she said that he should be seen by a doctor

if it didn't improve within two weeks, and therefore that he required prompt medical care, but she failed to ensure that he received that care.

The evidence concerning Mashak allows for a similar conclusion. On August 11, 2014, Mashak told Nieto that he was on "sick call" for his "toenails." *Id.* at 64. It's not clear exactly what information Mashak had about Nieto's injury at that point, as the second page of his HSR is missing, but apparently it was enough that Mashak thought medical attention was appropriate—but Nieto wasn't seen until November. Again, a reasonable juror could infer that Mashak knew that Nieto's toe injury required prompt medical care but failed to ensure that he received that care.

Similarly, Whalen examined Nieto on November 14, 2014, and noted that he reported significant pain in his big toes that began more than a year before. She also noted that he reported seeing a nurse about the pain in 2013 and "was supposed to see [a doctor] but never did." *Id.* at 23. She scheduled a follow-up appointment with a doctor "within 30 days [or] next avail[able]," *id.* at 24, but Nieto wasn't seen until two months later. And on September 11, 2015, Whalen noted that Hoffman had ordered "a physical therapy . . . consult for a splint or boot to help [with Nieto's] toe" and told Nieto that he would be seen by [physical therapy] as schedule allows," *id.* at 40, but there is no evidence that Nieto ever saw a physical therapist or received a splint. A reasonable juror could infer that on each of these occasions, Whalen knew that Nieto's toe injury required medical care but failed to ensure that he received the required care.

I turn now to the doctors. On January 14, 2015, Hoffman examined only Nieto's right toe even though Nieto complained of pain in both toes. Then on January 23, Hoffman reviewed the radiologist's report showing that Nieto's right toe was fractured. But Hoffman did nothing

13

despite Nieto's multiple requests for information and treatment. On July 31, Syed examined Nieto's toes and ordered splints for both feet and an x-ray of the left toe. It appears that on August 4, he reviewed the radiologist's report showing that the left toe was fractured. But Syed did nothing. On August 26, Hoffman finally reported the results of the August 4 x-ray to Nieto and ordered a physical therapy consult for a splint. But Nieto never received a splint. A reasonable juror could infer that each point in this timeline represents an instance of deliberate indifference when each doctor delayed, if not completely ignored, needed diagnosis and treatment for Nieto's injuries.

But I will grant summary judgment in favor of the remaining defendants because there is no evidence that they were aware of and consciously disregarded Nieto's serious medical condition. There is no evidence that defendants Karen Anderson (a health services manager at CCI until January 2014), Candice Warner (a health services manager at CCI until May 2014), or Michael Dittman (the warden of CCI) knew anything about Nieto's injury at a time when they could have addressed it. The evidence indicates that defendant Campbell met with Nieto early on and scheduled a follow-up appointment, which Nieto attended, so there's no indication that she consciously disregarded his medical condition. And the undisputed evidence shows that the defendants involved in the grievance review process—Hart, Perrenoud, Boatwright, and O'Donnell—believed that Nieto was receiving, or about to receive, the necessary medical care, so there was no reason for them to do anything more.

## B. Medical malpractice claims

I granted Nieto leave to proceed with state-law medical malpractice claims against nurses Anderson, Campbell, Valerius, Whalen, Mashak, Perrenoud, and Warner and doctors Hoffman and Syed.

Defendants first contend that Nieto cannot bring medical malpractice claims under Wisconsin Statutes chapter 655 against nurses, because nurses are not "health care providers" within the meaning of that chapter. *See Patients Comp. Fund v. Lutheran Hosp.-La Crosse, Inc.*, 216 Wis. 2d 49, 573 N.W.2d 572, 575 (Ct. App. 1997) ("[N]urses employed by a hospital to participate in the care of a hospital's patients, with the exception of nurse anesthetists, are not defined as health care providers."). But as I recently explained in *Smith v. Hentz*, No. 15-cv-633, Dkt. 150 (W.D. Wis. Mar. 19, 2018), "medical malpractice claims against state employees are not governed by Chapter 655, but are instead controlled by other statutes applicable to medical malpractice claims generally, and to claims against state employees in particular." *Id.* at 4. This means that Nieto's medical malpractice claims against the nurses proceed as "non-Chapter 655" claims, *id.* at 5, whereas his claims against the doctors proceed as Chapter 655 claims. Both types of claims are governed by common law negligence standards. To succeed on his claims, Nieto must prove that each defendant breached his or her duty of care to him and that he suffered injury as a result. *Id.* at 6 (citing *Estate of Hegarty v. Beauchaine*, 2006 WI App 248, ¶ 153, 297 Wis. 2d 70, 727 N.W.2d 857).

Defendants do not address the merits of Nieto's medical malpractice claims against the nurses. For the reasons discussed above, I will grant summary judgment in favor of Anderson, Warner, and Perrenoud, and I will deny summary judgment to Valerius, Mashak, and Whalen. I will also deny summary judgment to Campbell. Although there is no evidence that Campbell was deliberately indifferent to Nieto's injury, a reasonable juror could find that she failed to provide appropriate care for Nieto's injury when she treated him on November 12, 2013.

That leaves the two doctors, Hoffman and Syed. Defendants' argument concerning the doctors is difficult to understand. They say that "Nieto's entire case is based on the fact that

15

an August 4, 2015 x-ray showed a left broken toe, whereas the January 23, 2015 x-ray of his right toe showed only degenerative changes that could not be traced to a specific injury. . . . Although Nieto believes that the conservative treatment recommended by Dr. Syed after the left broken toe was diagnosed was inappropriate, he has no proof that it is contrary to the standard of care." Dkt. 44, at 26 (footnote omitted). That is inaccurate. For one, the January 20, 2015 x-ray showed "a small avulsion fracture." Dkt. 46-1, at 39. And more importantly, I do not take Nieto's claim to be concerned with "the conservative treatment recommended by Dr. Syed." Rather, his claim concerns the years of delay in properly diagnosing his injury and the failure to provide adequate treatment—at a minimum, the recommended treatment—before and after the diagnoses. For the same reasons discussed above regarding the Eighth Amendment claims, a reasonable juror could conclude that Hoffman and Syed breached their duty of care to Nieto, thereby injuring him by prolonging his pain.

Finally, defendants argue that they are entitled to summary judgment because Nieto does not have an expert witness to establish the applicable standard of care. I will not grant defendants summary judgment on this ground. It appears that this case may turn on disputes about the level of care that Nieto should have received and whether Nieto was injured as a result of the lack of care. For example, defendants argue that the "[s]tandard protocol for treating a small avulsion fracture would be rest and over-the-counter pain medication, which Nieto had available to him," Dkt. 57, ¶ 54. There is already some reason to doubt this, as the record indicates that Syed and Hoffman ordered splints for both fractures. But expert testimony will likely be helpful at trial. And as I previously indicated, Nieto has satisfied the threshold requirements for recruitment of counsel and would benefit from the assistance of counsel at trial because of his limited comprehension of the English language. *See* Dkt. 30. So

I will attempt to recruit counsel to represent Nieto, who may choose to pursue an expert opinion on the medical issues in this case.

ORDER

IT IS ORDERED that:

1. Defendants' motion for summary judgment, Dkt. 43, is GRANTED in part and DENIED in part.

2. Defendants Karen Anderson, Candice Warner, Michael Dittman, Isaac Hart, Ana Boatwright, Cindy O'Donnell, and Keisha Perrenoud are DISMISSED from the case.

3. The schedule in this case is STRUCK and proceedings are STAYED pending recruitment of counsel for plaintiff. If I find counsel willing to represent plaintiff, I will advise the parties of that fact. Soon thereafter, a status conference will be held to establish a new schedule for resolution of the case.

Entered March 20, 2018.

BY THE COURT:

/s/

_____
JAMES D. PETERSON
District Judge